Court Case of the Day, 19-30535, Peggy Mays v. Chevron Pipe Line Company, Mr. McLaughlin. May it please the Court, Sean McLaughlin, I'm half of the appellant, Chevron Pipe Line Company. In Valadolid, the Supreme Court mandated the use of the substantial nexus test for deciding when an employee's workplace injury is covered by the Longshore Harbors Workers' Compensation Act, also known as the LWHCA, by virtue of 43 U.S.C. 1333B of the Outer Continental Shelf Lands Act. Although the question of LHWCA coverage is most often litigated in the context of an illegal issue of coverage has other consequences. Here if Mr. Mays' injury is covered by the LHWCA, plaintiffs can pursue tort remedies against a non-employer third party like Chevron Pipe Line Company. If it's covered by the LHWCA, they can pursue your client in tort? Yes, Your Honor, yes, but if it is not covered by the LHWCA and is instead covered by the then my client, Chevron Pipe Line Company, is a statutory employer under Louisiana Act. Is that why you both put the first question to the jury saying, is there a substantial nexus? If not, we're in the world of Louisiana Workers' Comp? If so, we're in the world of LHWCA? Yes, Your Honor, because this issue was actually decided several years prior and there was no dispute over if the Louisiana Act implies that Chevron Pipe Line Company meets all of the requirements to be a statutory employer and thus is immune. So the issue of coverage was first and foremost on the verdict form, absolutely correct. Well as I understand it, the family of the decedent received LHWCA benefits. Doesn't that play a role in which law applies? Absolutely not, Your Honor. This issue was argued by the plaintiffs in the lower court and the district court correctly rejected it. There's an older case, it's the Brown case, and also there's a Fifth Circuit case adopting Brown-Charles where prior law there was a system called election remedies where basically an injured plaintiff could pick Louisiana Act or the Longshore Act. The legislature actually in 1990 passed a statute preventing that and says, look, if you're covered by one, you're not covered by the other. There's been a lot of district court cases that say, look, in the event of benefits being paid under one act or the other, legally that's not determinative because sometimes these issues, as this case I think presents, aren't easy. And so just because benefits may be paid by someone erroneously, that doesn't determine coverage. Well, I want to know your answer. Our court in Grantham v. Avondale Industries, Inc., are you familiar with that case? Grantham. Grantham v. Avondale Industries, Inc., 1992. Don't recall it, Your Honor. Was that cited in the briefs? Cited by the district court, not in the briefs. OK. Held that Louisiana statutory employer defense is unavailable to a defendant sued by an employee who is receiving benefits from his direct employer under the LHWCA. I would question that. If we look at the district court's decision, you mentioned that was a 1992 decision from this court. The act that- I happen to be on the panel, but I don't have any recollection of this court. OK. And I guess, being as it was in 92, I would imagine that the underlying- That's that old law. Yes, Your Honor. I would imagine that the underlying incident probably occurred several years prior, just based on the manner of cases, how they work through the court system. Prior to 1990, that may have been an issue, because that was the Brown decision, which the court talked about in the district court. There was the whole election remedies. That's a different- The law has changed since then. But Grantham's been cited almost 200 times, never with criticism. It's an old law. But I guess, it may not go to your issue, and I want to let you argue your issue. But when I read the Brown per curiam, one paragraph, Louisiana, I mean, that's pretty clear, the point you're making, which is, you get one or the other. But I think Judge Barstow's question is one that did make me pause, which is, once you are getting one, why is the Workmen's Compensation Act relevant at all? And it may not be crucial to your argument, but I guess that's where I was a little confused. Sure, Your Honor. And, you know, the issue with Brown and Charles is, you know, at the time, we talked about the law. The specific statute that was enacted by the legislature post-Brown is Louisiana RS-23-1035.2, which says, look, if the LHWCA applies- You need to speak more slowly when you're rolling those letters off. Absolutely, Your Honor. I apologize. 23-1035.2? Yes, Your Honor. We actually cite that in a footnote in our brief as well. And I would also refer you to the district court's rejection of this exact argument, which is in the record at 1540 to 1541. The district court cited, post that statutory revision, post revision under the correct law, the new law, Your Honor, of the Bodan decision, it's a Louisiana appellate decision, saying, look, just because an employer pays benefits under the Louisiana Act or the Longshore Act, that is not determinative of the legal issue of coverage. And that's instead determined by 1333B, the statutory language that you put to the jury? Yes, it's really determined by the valid dollar itself, which told us what the test for coverage under 1333B is. Yeah, you think that's a- just so I can understand, you think that's a legal issue that should have knocked out the- that should have been determinative on this, right? The valid dollar issue about who is the employer? Absolutely, Your Honor. But what Judge Higginson is asking about is the question that was submitted to the jury, which has to do with substantial nexus. The actual, if you look at the jury charge, which we obviously objected to, as we noted to, because we think it's an incorrect statement of the law, it asked the jury to find whether or not the plaintiffs had proven, by proponents of the evidence, if there was a significant causal link between the all-new CS operations of Chevron Pipeline Company and the injury. I paraphrased a little bit, but those are the key parts. And we submit that was an error, because under the clear holding of valid dollar, valid dollar holding was repeated three times in the decision. And it said the plaintiff's claimant, because that was in the context of an injured employee seeking benefits, the claimant bears the burden of proving a significant causal link between the injury and his employers on the CS operations. Right, and he thinks the relevant employer, for purposes of the law, is Fermanite and not Chevron. Absolutely, Your Honor. Okay. Yes, that is the whole basis of the first argument. Yeah. If you want me to... And that's, if we agreed with you on that, we would not get to the substantial nexus argument. You wouldn't judge it. Yeah, absolutely not. Because here, the record is undisputed that, number one, I think it was a stipulated fact that Mr. Mays was employed by Fermanite. Mr. Fermanite had no on-new CS operations at all. There's nothing. And that was kind of undisputed. And I think that's why... Well... Yes, sir. Well, you're helping me, but there are a lot of points you're making. When you say they had kind of no activities, Fermanite is going out there to Chevron's platform, and they're working on a valve that is connecting, according to the facts the jury seemed to have credited, to Chevron's Continental Shelf activities. So why wouldn't Fermanite have had its operations connected to the Continental Shelf? I think that gives, I mean, you're going to 1333B, Your Honor, which is, this is an issue that has plagued the circuits for years. The question is whether Fermanite had on OCS operations. There is an absolutely a situs requirement for the relevant OCS operations. There's no longer a situs of injury requirement, which is what Validolid addressed, but there is a situs of operations requirement. And if you look at Validolid's holding, it says the significant causal link between the injury sustained and the employers on OCS operations. Here, there was no dispute, but how does a case like Frederick get written then? In other words, Mobil Oil was what I think of as the general contractor in the position that Chevron was in, and yet they are subject to tort suit, even though the employer, this specific employer, is someone equivalent to Fermanite. Absolutely, and that's a great question. In Frederick, Your Honor, that incident occurred on the OCS. And we know that because they were applying Louisiana law as surrogate federal law pursuant to 1333A, a totally different position, which has a situs requirement. So the result of Frederick, the Longshore Act could, I mean, as long as he was covered because he was injured on the shelf, if the Longshore Act requires... So your legal, is the first argument that question one should never have been presented at all, or question one was miswritten and described the wrong employer? Which is your argument? Miswritten, Your Honor. So you do agree that Validolid says this depends on individual circumstances, and the district court changed its mind, saw a disputed fact, and sent those circumstances to the jury. But you're disagreeing with the way the question was phrased. That was legal error. Yes, Your Honor. I disagree with the test that, I submit that the district court used the wrong test. The test is the plain language of Validolid, which says a significant causal link with the employers on OCS operations. That's the issue. But the statute doesn't talk about the employers. The statute just talks about the connection between the injury and the operations, correct? Absolutely, Your Honor. That's 1333. So what circuit has Act Circuit has interpreted Validolid to require that it be the specific employer or general contract? Post-Validolid? Yes. There are none, Your Honor. Validolid is the only case on this issue. And that's a great question. And I really think that's where the district court erred. Because I think what the district court did is they saw Validolid. The holding's very clear. But they went behind Validolid. And they tried to take his employer language in Validolid's holding and interpret it by looking back to 1332. That to me is the error, Judge. Because Validolid was decided to determine once and for all what test means. Because if you look at Validolid. And at jury conference, you objected to putting Chevron in. Absolutely, Your Honor. And what was Judge Jackson's response? At the jury conference, Judge, he referenced law of the case. It's the same thing he referenced when we made our Rule 50 motions at both the conclusion of plaintiff's evidence. And again, we re-urged him. We wanted to leave no doubt. We objected to this. So it was law of the case. The predecessor judge's ruling reminded me what it was on this issue. The predecessor judge's ruling, it meandered a little bit. Because if you recall, initially when we raised this issue, it was on summary judgment. And the district court looked at the his employer issue. Because we said, look, there's nothing with Fermanite, case closed, done. The district court said, well, Chevron Pipeline Company is arguing that their statutory employer. And there's no statutory employers relevant in Validolid. So I think maybe I can look at Chevron, right? Now ultimately, she said there's no substantial nexus as a matter of law. So she dismissed the case, which was later on reconsideration issue of fact. Ultimately, Judge, she recognized she wasn't saying that because of statutory employer that she was looking at Chevron. She went to exactly what you did, Judge Higginson. She looked to the language of 1333b2. And the language of that, I mean, it says the term employer means an employer, any of whose employees are engaged in such operations. It's a little circular. And so. It's perfectly circular. It's not just a little. I was being modest. So the relief, if you prevail, would be reversed for a retrial with the correct, the instruction you asked to have been given? Judge, if there were a substantial nexus between the employer's activities and the shelf, then we'd still be in a world where a third party general contractor could be liable under state court law. I think the result is simply reverse it. Reverse, period. But why were you asking that your jury decide the question then? We submitted that it was an issue of law. And after the plaintiffs put on their case, we said rule 50 motion, there's no evidence that Fermanite has any operations. Case is over. And the judge disagreed because they said, no, I interpret the test as to include Chevron Pipeline Company. So I'm going to allow it to go to the jury. Rule 50 says if there's no evidence as a matter of law. Yeah, you don't think that, as I understand your argument, you don't think that should have been submitted to the jury because you thought the prior, the first summary judgment from the first district judge was the correct result. And then the second, the reconsideration, was where your argument at least is where the district court erred. And then the second district judge said, well, I'm going to just treat that as law of the case or whatever. And so I'm going to submit this to the jury with the question vis-a-vis Chevron and not Fermanite. Right? In a sense, your honor, I guess let me correct on one point. When the judge dismissed the case at first, she did not dismiss the case because of no on-escase operations of Fermanite. That's the issue that she just bypassed that and said, look, I don't think it's Fermanite. I think I can look to Chevron Pipeline Company. But even looking to Chevron Pipeline Company, that's the second argument I'm raising on appeal is that there is no substantial nexus. Even if you look, even under the application of the test, which I think was wrong, under these facts, there is no substantial nexus. Is it fair to say that the legal conclusion that you are asking us for in your first issue is that Chevron is not an employer under 1333B-2? Is that right? We are not the employer under the plain language of valid-dolid. Valid-dolid interpreted 1333B. 1333B was subject to many different interpretations. That's a causation issue, though, right? That's what valid-dolid took the case from the Ninth Circuit to determine what's the proper causation test, right? The proper test, period. The proper test. The proper test. And valid-dolid is interesting because unlike all other cases where this issue of coverage was litigated, valid-dolid just litigated the test. There wasn't a determination of Mr. valid-dolid being covered or not, either in the Ninth Circuit. The issue presented was the test. And these issues were... Our court had a but-for. What did our court had one test, another court had a different test, and the Supreme Court chose the sort of middle test, right? Well, we originally had a but-for. We went to situs of injury. The Third Circuit had a but-for. The Ninth Circuit came up with a substantial nexus test. There was actually a fourth test proposed by the Solicitor General. It was difficult, and I think that's where the district court ultimately erred. I guess my point was only that, and I'm sorry, but my point was only that that is trying to figure out what is the proper causation, right, between the injury and the OCS-related activity. That's what... It wasn't litigating what the meaning of an employer was. Absolutely not. Okay. The question was, what is the test? And it goes back to causation. Yes, Judge. You have rebuttal time. Thank you. You do add two minutes to Appellee's argument time. May it please the Court. I'm Jill Pierce, representing the Appellee, the Mays family. I will address the law regarding substantial nexus, as well as the evidence that was presented at trial, to support the jury's finding on that issue. My co-counsel, Ms. Leger, will address Chevron's argument that the damage award was excessive. Ms. Pierce, the first question that was asked by one of the judges was about LHWC benefits being received by, I guess, by your client. Do you agree with what I understood counsel opposite to say, that that issue of receipt of LHWC benefits, that's not relevant to the legal questions we have to decide here? I believe it's determinative. Okay. Why do you think that? Under the Brown case out of Louisiana, as well as the Clark case out of the Fifth Circuit and the Grantham case. There was evidence in the record, six weeks after Mrs. May's husband was killed, she got a letter from Liberty Mutual. You're being paid benefits pursuant to the Longshore and Harbor Workers' Compensation Act, which will continue until you remarry or you die. And about a year later, when Chevron Pipeline filed their motion for summary judgment, she continued to receive those benefits. Paid by, paid by, I know through Liberty Mutual, but paid by which entity? Fermanite. Fermanite, because under the contract between Chevron Pipeline and Fermanite, Fermanite was required, not only to obtain state law workers' compensation insurance coverage, but also federal workers' compensation coverage. And it specified it in the contract. So Fermanite obtained it, and that's what Mrs. May's was paid for. But Brown and Charles would then say, again, tell me if I'm oversimplifying, because receiving under the federal compensation scheme, we really don't need to look at the Workmen's Compensation Act at all. It's irrelevant here. But that doesn't answer what I thought the argument has been clarified to be an oral argument, which is, was there jury instructional error to tell the jury that they could find the substantial nexus based on Chevron's status as opposed to the direct employer's? Right. And I believe the jury was properly instructed. The parties in the Valladolid case did not litigate, and the court did not adjudicate the meaning of the words or the term employer. So if you read Valladolid in connection with 1333B, and also as interpreted by this court in the Barger case, you don't have to look at the direct payroll employer. Yeah, but Barger did involve the direct payroll employer, did it not? It did. The helicopter company? Okay, so that couldn't really bear on the issue of whether the employer in 1333B includes a third party. If you look at, Your Honor, the Shell case, the Gates v. Shell case, the Frederick v. Mobile Oil case, as well as the Baker case, which was decided by this court, all of the those cases were employed by companies that were not oil and gas producers on the Outer Continental Shell. In Gates, he was employed, he was a pipe fitter, employed by Total Services. In Frederick, it was a welder, employed by Max Welders. In Baker, which was decided by this court in 2016, Mr. Baker's employer was Gulf Island Marine, a fabrication company. In that case, it was an appeal from the denial by the Benefits Review Board of Federal Workers' Compensation Benefits. In that case, the court said that there was not a substantial nexus because Mr. Baker's injury was too attenuated from any activity on the Outer Continental Shelf. In that case, the court even noted that Mr. Baker was injured on land, and the court said that was geographically distant from the Outer Continental Shelf. If you look at the injury in this case and Chevron Pipeline's flow diagram that was in evidence, he was, as admitted by Chevron Pipeline's employee, they were barely in state waters. They were very close to the Outer Continental Shelf, and what caused Mr. Mays's fatality was gas coming substantially from the Outer Continental Shelf. It's our position that this case differs from the Baker case because there was that geographic proximity, but also Mr. Mays, because of what he was doing that day, he was exposed to the unique hazards and risks associated with development of the Outer Continental Shelf. And that argument is supported by the fact that the valve he was working on was wrapped with adherent wrapping, a protective wax coating, and they were unable to, they all believed they were working on a WKM valve, and that the work they were doing that day would not breach the pressure barrier. But because the valve was wrapped all together, they were not able to realize that Chevron's own records for 15 years were wrong about exactly what they were saying. And most of the trial was devoted to that, and that is an issue, the second issue, but before you get off the first one, you agree that they did preserve the objection to the jury charge complex. They said, this has to be focused on Fermanante's activities, not Chevron's. I do believe they preserved that error. Okay. And then you heard his description of what the district court said was the reason instead Chevron would be put in, and the district court said, well, it's law of the case. So if you accept that as the best argument, then it just takes us back to the original ruling. And why is it that instead of employer, Fermanante, we would be looking at Chevron's activities, which clearly, to me, do have enormous to do with the Outer Continental Shelf? Why did the original district judge say the focus here is on Chevron, not your employer? Originally, she said because they were claiming to be statutory employer, and she did change her position on that a bit. Who was claiming to be, Chevron was claiming to be statutory employer? Yes, your honor. And originally the district court said, well, that, I'm paraphrasing, I could be wrong, I've already been wrong several times, that that means that Chevron is not an employer under 1333B. Instead, we should look to Fermanante. Fermanite. Now I'm... That's correct. I do that to a lot of people. And if you... Okay, so you acknowledge the record, but what's your best argument for that original rule? My best argument is 1333B, as interpreted by this court in the Barger case, that you don't have to look at the direct payroll employer. In fact, what Valladolid held is that there are only two requirements to be covered, or to show a substantial nexus. The only two requirements is the claimant seeking benefits under the Outer Continental Shelf Lands Act must establish a substantial nexus between the injury and extractive operations. But they're not even focused on the question that we're focused on here. That's the nature of the causation requirement in Valladolid, right? That is correct. And we know now it's substantial nexus. That is correct. But we're focused on a different question. Wouldn't you agree? I would agree. Employer. Yes. Like, what's the meaning of employer? And I look at the 1333B, and I see that with respect to disability or death of an employee, okay, but an employee of whom? Of an employer, right? And then I look at the definition. It says employer means an employer. Any of whom employees are employed in such operations. Correct. How am I supposed to get anything out of that? The legislator could have said that employer is someone that employs the injured employee. But it didn't limit it to that. It just says any employee. That would mean that somebody who's injured as a result of OCS operations, an employee, can be an employee with respect to anybody who employs anybody. Why should I read the statute that way? Well, the protection against, I think Chevron has argued about the potential for observed results. The protection is the definition of employer, employee under 1333B, as well as the substantial nexus link requirement. So their injury has to be. . . But it's an employment compensation statute, right? It's a federal employment compensation statute. And so it seems that the premise of that is an employer-employee relationship. And so I have to understand how broad that is, right? The courts have held that the federal workers' compensation statute should be liberally constrained. Sure, of course, but coherently. Circle all this back. I'm sorry. No, go ahead. No, no, you go ahead. No, no, I'm done. Circle this back to what you told me at the start of your argument, that the fact that the payment, the LHWCA benefits were paid by Furmanite is determinative. Your argument seems to be just the opposite. Well, I believe under the clear statutory law of Louisiana, the 23. . . 23.1035.2, which the title of that is claims covered by certain federal laws. And that statute says no compensation shall be payable in respect to the disability or death of any employee covered by the Federal Employers' Liability Act, the Longshoremen's and Harbor Workers' Compensation Act, or any of its extensions, or the Jones Act. So Louisiana statutory law 23.1035.2, black letter law, says nothing in our State Workers' Compensation Act applies when the person is covered by federal workers' compensation benefits. And 905 says federally you're only entitled to compensation. That would be from the employer. I'll call him F instead of trying to pronounce it. But you're saying that the case that you tried to in front of the jury was a third party that had, through its negligence, mislabeling the vow had caused the client's injury. Correct. Let's assume, and this is a difficult case, I'm appreciating the arguments, totally open-minded, but let's assume opposing counsel were right and there was jury instruction on it. Do you agree with the second claim, that at that point it would be reverse and render? Or do you think that the F's activities had a connection to the Continental Shelf too? I believe that they do, Your Honor, just like the employer Max Welders, just like the employer Gulf Island Fabricators. Although those employers are not oil and gas producers that have extractive activities on the Outer Continental Shelf, they are what I've called in my own analysis of this, they're employed by a supportive industry, the valve technicians, the pipe fitters, the people that have to go out there and do work to help Chevron Pipeline transport by pipeline their natural gas from the Outer Continental Shelf. In hindsight, Judge Higginson, I think possibly the court could have said that you have plaintiffs proved by a preponderance of evidence that there is a substantial nexus, that is, a significant causal link between James Mays' death and operations conducted on the Outer Continental Shelf for the purpose of extracting or transporting natural resources by pipeline from the Outer Continental Shelf. But the jury question has delivered focused on Chevron's operations. Correct. Would you agree that that's a very different question than the one you just phrased? It is different because it focuses on Chevron's extractive activities. The one that was given. The one that was given. I see I'm running out of time, so I just quickly want to go over the six items of evidence that I believe supports the jury's finding of substantial nexus. First of all, we have the flow diagram that shows the two platforms on the Outer Continental Shelf. We have the testimony of Mike Sawyer, who reviewed the piping and instrumentation diagrams and said that he, in his opinion, the gas was coming substantially from the Outer Continental Shelf. We have Reggie Mahdi's testimony. Reggie Mahdi is the Chevron Pipeline person in charge of this job, that when they breached the pressure barrier and the gas blew out, he had to call and have the production shut down from the two platforms on the Outer Continental Shelf, the Tiger Shoals and then the South Marsh Island 239 platform. And then also, and this wasn't really argued that much to the jury, but I think it's very important, in Chevron's own investigation about what caused this, part of their timeline, which is in the record on page 4948, they say platforms producing into the pipeline slash valve were shut in. So their own investigation shows that the production that they had to shut in were the platforms producing into that pipeline and into that valve that Mr. Mays was working on when he was killed. And we believe that all of those items of evidence are more than sufficient to support the jury's finding. Just one second. Did she get the two minutes added? She got one. She got one for each? Yeah. And you're comfortable with that? Unless you have any other questions. Well, I have a lot of questions. Not just for you, for both sides, but we'll hear. I'll take my sister's minute. Okay. Is that your sister being a fellow attorney? Or is that literally your sister? That's literally my sister. Okay. I should have said my co-counsel. I'm sorry. Maybe you're the older one, so you can get away with it. I remember your opening argument in trial. You did say you were the older one. Oh, you did the opening argument? I did. I want to apologize for my colleagues. Well, I'm a younger brother. And notice how she's kept the time in whole. Thank you. Go ahead. You have a minute. What other questions? You said you had the evidence. That was the evidence of the substantial nexus between the Chevron operations and the injury. You said you had six. I have four here. Flow diagram, Sawyer testimony, Mahdi testimony, shut-in diagram. Did you have anything else you wanted us to note? The testimony of Lynn McCall, who was the field team leader. He talks about this area, the Henry Hub area, how it's Chevron Pipeline's gas gathering system that transports gas from offshore. We also have, and it's why I provided a picture to the court, the picture of the valve gear operator being wrapped in the protective coating. As I said earlier, had this job been on land, that valve would not have had to been wrapped like that so that it was difficult for the crew to determine when they were going to be breaching the pressure barrier. Had this been on land where the valves do not have to be wrapped to protect against corrosion, Mr. Mase would not have been killed. You almost conceded error on this jury instruction because it used Chevron instead of Fermanite. Why do you think, if that was an erroneous jury instruction, why wouldn't that result in reversal, at least for a new trial? Because I believe it's harmless error, Your Honor. Why? Because of Fermanite's supportive role in helping Chevron Pipeline in their ability to transport by pipeline natural gas from the Outer Continental Shelf. But how can that be harmless error since the jury didn't have an alternative? The question was related to Chevron. So that's all the jury dealt with. Right. I agree, Your Honor. I'm out of time if you'd like me to answer. Sure. You can take some of your sister's time. Okay. It goes back to the argument that because Fermanite is one of those employers like Max Welders or Gulf Island Fabricators that they are in a supportive role. So even though in my other proposed jury charge we would not have said Chevron Pipeline by name, it's those activities that the jury would be asked to look at. So for that reason, I believe if there was error, it was harmless. Well, I'm assuming we'll be able to look at the record and see what Fermanite's activities are that you're talking about with respect to supporting production so we can at least understand the argument that it would be harmless error. So all that information is in the record, right? Yes, Your Honor. Okay. Thank you, Counsel. May it please the Court. Jane Lege on behalf of the plaintiffs, and I am the older twin and just thankful not to be asked if I'm her mother because that has happened before. It gets more and more complicated, the older twin. Okay. Sir, that's Your Honor. Go ahead. I'm going to address Chevron Pipeline's argument that the general damages awarded to James May's widow, Peggy Mays, was excessive. And under Louisiana state law, that question must be answered as a threshold by looking at the particular plaintiff, the particular loss, and the particular circumstances. And then only if those particular facts of the case show that no reasonable fact finder could have awarded that amount of damages, then does the Court look at how to adjust the award. Just for purposes of this recording, statewide since this is being tried, as I see it, in the large part under the LHWCA, we're looking at state law on this. I know it's a diversity case and so on and so forth. I know it gets very complicated, but statewide? Due to the Gasparini case out of the U.S. Supreme Court, Your Honor. Although this Court, respectfully, about six months ago, recognized that this Court has not consistently applied state law in reviewing damage awards in diversity cases. In other words, sometimes the Court has looked to the judge-created maximum recovery rule that post-Gasparini, the issue in a diversity case is governed by state law. But I'm prepared to address the Court on either one of those standards because I think that, frankly, to me, the federal standard, Judge Rubin's maximum recovery rule, it's not in the briefing, but it did serve as a good gut check to me when I was looking at the award and looking at this issue. There are three things about how this award came down and how the case was tried that I think should be important to the Court in deciding whether or not these damages were excessive. First of all, there were four plaintiffs who had claims that were submitted to the jury for determination. There was Mr. May's wife and then his three adult children. The three adult children, their awards are not being challenged by Chevron Pipeline as excessive. I believe if this was a jury that was acting unreasonably and being driven by some sort of prejudice or passion, you would see excessive awards across all of the plaintiffs' claims and not a single plaintiff's claim. That's number one. Secondly, the District Court vigorously protected the record in this case and the jury in this case from any evidence that may have resulted in sympathy or an unreasonable passion. For instance, the nature of Mr. May's fatal injury was never fully disclosed to the jury. There were no photographs post-incident. Those were objected to and excluded. The autopsy report was objected to and excluded. And finally, facing exclusion of both of those pieces of evidence, there was an attempt made to submit only the coroner's sketch of an outline of a body with hash marks at Mr. May's head showing that the head injury had been the fatal injury. That was objected to and excluded. In the record on appeal at page 3825 through 3831, Mr. Motti, the Chevron Pipeline person in charge who was on the platform the day Mr. Mays was killed and an eyewitness to that death, was reluctant to describe what he saw that day. When he expressed that reluctance, Chevron Pipeline objected and the court carefully instructed Mr. Motti what he could tell the jury about that injury, which was simply that when the valve stem was ejected from the valve, Mr. Mays sustained a fatal head injury. The last thing I would point out to the court is that during their deliberations, the jury did ask a question. It was question number two. They wanted to know how their allocation or apportionment of fault would impact their damages of ward. And the court sent back an instruction that they were not to consider any allocation of fault in determining the award, neither to reduce it or enhance it. So I think that those are three important things that the court should consider when determining whether or not these damages are excessive. But in addition to that, I think the notification that Ms. Mays received of her husband's death was at a time where she was waiting on him to meet her in a public venue at a casino to celebrate their 39th anniversary. Chevron Pipeline does not dispute that this couple had a long, almost 40-year loving and extraordinarily close marriage. What Chevron Pipeline seems to believe is that because Ms. Mays lost that relationship suddenly, that it should somehow lessen the impact. Mrs. Mays was waiting for her husband to come celebrate their 39th anniversary. When he didn't answer his phone that day because he couldn't, she figured that was just like him to come up and surprise her. So she sat and anxiously looked over her shoulder periodically for her husband. What she got was a phone call from his brother, the phone call that she would never see her husband again. And she was so grief-struck in that public place, she fell to the floor. She could not stand or walk on her own volition and had to be carried out of the casino. So when you look at the threshold question, this particular plaintiff, this particular loss, and this particular circumstance, we do not believe the award was excessive. Thank you, Counsel. Rebuttal argument? Thank you, Your Honors. A lot to unpack in a short amount of time, so I'm going to try and move as quickly as possible. Counsel just argued that the family's receipt of LHWCA benefits is determinative, really, on the issue of coverage. I would point out that issue was not briefed. It wasn't argued at all in their brief. So, number one, I think it's vague. And number two, it's simply wrong. And I would urge this Court to read the District Court's decision on this fact. Again, Record Cites 1540, 1541. How did you argue otherwise in your brief in the District Court? Exactly what I just said, Your Honor. And the District Court got it right. I'll read. It says, Where the facts show an injured employee was not covered by the LHWCA, Louisiana workers' compensation law, including its statutory employer defenses, is implicated citing the care for Smith, the Bodan decision. This was conceded below. But no one's arguing if they're not covered, right? The argument is if they are covered and getting benefits, we don't look at the WCA at all. The issue is the issue of coverage. The receipt of benefits, whether it be erroneous or what has no relevance to the legal issue of coverage. If Mr. Mays is covered by the LHWCA, then the Louisiana Act doesn't apply. They're mutually exclusive. There's no dispute on that. So it's an issue of which Act applies. That's the legal issue before the court on its de novo review. And on that, you know, she's mentioned the Gates case and the Frederick case and talked about their direct employers. The problem with those cases is those employees in Gates, Frederick, every other case she cited except for Baker, they worked on the OCS. So if they worked on the OCS, their employer has operations on the OCS. That's the distinction of that. So those cases really don't give us any indication on the employer issue, which is the legal issue here. And Judge Duncan, you had made some comments about this is a workers' compensation scheme. We need to keep that in mind. It focuses on the relationship between the employee and their employer. You're absolutely correct. This issue actually came up in Validolid. If you look at Validolid's decision, the Solicitor General in that case of the United States was advocating for a test. It's the fourth test if you read the decision. And he was advocating for a test that looked at employees of employers engaged in such operations. And this exact issue, the question of, you know, should we look at it in the context of the workers' compensation scheme was discussed at oral argument. And during the oral argument, they talked about this, that the Solicitor General said, we think that when you're talking about a workers' compensation scheme, the kind of causation that is relevant is the causation caused by the employment relationship itself. That is, I submit, supports a plain application of Validolid's test. The test says the injured claimant bears the burden proving a significant causal link between the injury. If, let's say, hypothetically I agree with you on that, where does that lead us? Where does that lead the panel to dispose of this? What do we do as a result? Reverse and render, Your Honor. Why not new trial to consider whether Fermanite's activities have a substantial nexus to us, I guess, related? Because we move to Rule 50. Under Rule 50, if there's no evidence to support it, then reverse and render. We can look at the evidence in the record to see whether Fermanite has any. There is no evidence in the record of Fermanite having on OCS operations. That's the key point, and that's, I think, the point that they kind of look at. There's absolutely evidence that Fermanite did work at Lighthouse Point, but that's in state waters. There is zero evidence that Fermanite did anything on the OCS, and there absolutely is. You're referring to the language, an injury occurring as a result of operations conducted on the Outer Continental Shelf in 1333. Judge, I'm referring to the language contained in Valadolid itself. And I think that's the kind of difficulty here is that... But isn't that back to the exact test that the Supreme Court said, don't follow? I'm sorry? That's exactly the test the Supreme Court said we shouldn't limit it to. It shouldn't be limited simply to the Continental Shelf. The Supreme Court was saying is they were rejecting Mills. Mills said there's a situs of injury requirement, saying Mills at pre-Valadolid, the Fifth Circuit of Mills said, look, if the injured employee is not injured on the shelf, he's not covered. That is what the Supreme Court did away with. I'm not arguing for that. There is an absolute situs requirement for the on OCS operations. It doesn't matter if the injury happens on land, but the situs of OCS operations, those OCS operations performed by the employer, the direct employer, must be on the OCS. That's the key distinction. Chevron can employ subcontractors for all their offshore pipeline coming back to the Continental. In any injury, let's assume it's utterly Chevron's negligence. But by virtue of them using a subcontractor instead of direct employment, they've gotten themselves out of the long-term net? That's your approach? No, Your Honor, that's not. If the employees of the subcontractors, like, for instance, let's use a hypothetical. Say Mr. Mays actually did some work on the shelf. Well, then in that situation, his employer, Fermanite, has operations on the shelf through its employees. That's how corporate entities act. They act through their employees. So here, the point is, and I see my time is up. No, go ahead and answer that. Okay. The point is, Your Honor, is that here the record evidence is clear that Mr. Mays, you look to his work, his work was in Louisiana waters or at land on Erath, Louisiana. He never went to the shelf, ever, period. Validality, the guy spent 98% of his time on the shelf, but his injury happened on land. Okay. Thank you, Your Honor. Thank you. We appreciate the attorney arguments in this case.